**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No.: 21-CR-508 (1) (BAH)** |
| **LUKE WESSLEY BENDER** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S AMENDED SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum. For the reasons set forth below, the government requests that this Court sentence Luke Wessley Bender to 30 months of incarceration, at the top of the applicable Sentencing Guidelines range; three years of supervised release; $2,000 in restitution; and a $180 special assessment.

## I.    INTRODUCTION

Luke Wessley Bender was one of the very few rioters who breached the Senate Chamber and ascended the Dais during his participation in the January 6, 2021 attack on the United States Capitol. That violent attack forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Bender planned for conflict in advance of January 6. On January 5, 2021, he posted a SnapChat video with the caption, "Antifa and BLM ain't nothin. I'll see y'all tomorrow in dc. I ain't afraid to get dirty if I have to." The video includes images of Bender wearing a tactical vest

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

in front of a Confederate flag and an American flag.  Then, on January 6, 2021 Bender and his co-defendant, Landon Bryce Mitchell, traveled together to the former President's "Stop the Steal" rally, marched to the Capitol, and made their way onto restricted Capitol grounds.  As they arrived near the Capitol Building, Bender and Mitchell paused for a picture, which Bender later shared on his TikTok social media account, accompanied by a song entitled, "Go to War."  Bender and Mitchell climbed scaffolding onto the Upper West Terrace, where Bender took a cell phone video that he later shared on TikTok.  The video showed police officers attempting to defend the Capitol Building from the rioters below by using pepper spray.  Bender then panned to an entrance of the Capitol Building and exclaimed, "we're storming the Capitol!"

Bender and Mitchell then unlawfully entered the Capitol building, went into the Rotunda, made their way down several hallways, and eventually walked into the Senate Chamber and onto the Senate Floor.  They remained on the Senate Floor together for approximately five minutes until a group of Capitol Police officers arrived and directed them to leave.  While on the Senate Floor, Bender and Mitchell leafed through and examined documents on Senators' desks, ascended the Senate Dais, and posed for pictures, including ones taken next to the self-proclaimed "QAnon Shaman," Jacob Chansley.  Later on January 6, Bender captioned various posts on social media as follows: "It was so awsome [sic] to be apart [sic] of this.  We made our voices heard"; "A once in a lifetime day.  #patriots #fyp[2] #trump2020 #viral #dc #patriotparty #proudboys[.]"; and, "Today was something special if you were there.  It was great to be apart [sic] of it.  #trump2020 #trump #dc #capital[.]"  When he returned home on January 6, Bender deleted from his mobile phone the photographs he had taken at the Capitol, stopped using that phone, and began using a new phone

---

[2]  #FYP is a TikTok hashtag that means "For You Page."  Tagging a video with #FYP is a way to try to get content recommended by TikTok on a front landing page so that people who may not follow the poster potentially will see the content.

that his parents had purchased for him.

The government recommends that the Court sentence Bender to 30 months of incarceration for violating 18 U.S.C. § 1512(c)(2), a sentence which is at the top of the advisory Guidelines' range of 24 to 30 months. A 30-month sentence recognizes Bender's admission of the facts supporting his conviction but also reflects the gravity of his conduct on January 6, 2021, his destruction of evidence of his crimes, and his full criminal history.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense filed in this case, ECF No. 93 at 3-5, for a summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, which was intended to, and temporarily did, disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Luke Wessley Bender's Role in the January 6, 2021 Attack on the Capitol

#### *Conduct Leading Up to January 6, 2021*

Bender lives in Fairfax, Virginia. Prior to January 6, 2021, Bender posted various images and videos on his social media accounts showing his belief that the 2020 Presidential election was "stolen" from then-President Donald J. Trump.

On December 31, 2020, Bender posted a video to his TikTok social media account indicating he intended to travel to Washington, D.C. on January 6, 2021. Bender, wrapped in a flag bearing the name of former President Trump and standing in front of two American flags, swayed to music. Superimposed on his video is the message, "Jan. 6th[.] Patriots Its time to come together in DC. And fight for our country. Just like our President Donald Trump has done for us. Its time we fight for him! See yall in DC January 6th."

3



*Image 1: Screenshot of TikTok Video from Jan. 5, 2021 (Ex. 4.6)*

On January 5, 2021, Bender posted a SnapChat video of himself, clad in a tactical vest, in front of a Confederate flag and an American flag.  Bender included the caption, "Antifa and BLM ain't nothin.  I'll see y'all tomorrow in dc.  I ain't afraid to get dirty if I have to."



*Image 2: Screenshot of SnapChat Video from Jan. 5, 2021 (Ex.5.2)*

4

### *Approach to the Capitol*

On the morning of January 6, 2021 Bender traveled to Washington, D.C. with his co-defendant, Landon Mitchell, via Metro train from Arlington, Virginia.  Bender and Mitchell attended the "Stop the Steal" rally at the Ellipse.  Bender later told the FBI that the rally on January 6, 2021 "was for the stolen election," and that is why he attended.  Ex. 3.1 at 26:32.  Bender, wearing a black cowboy hat and a camouflaged jacket over a black "letterman jacket," carried a large flag bearing the name of former President Trump. Bender and Mitchell and then marched with other protestors to the Capitol grounds.



*Image 3: Image from Jan. 6, 2021 (Ex. 2.1)*



*Image 4: Image from Jan. 6, 2021 (Ex. 2.2)*



*Image 5: Image from Jan. 6, 2021 (Ex. 2.3)*

As they arrived near the Capitol Building, Bender and Mitchell paused for a picture, which

Bender later shared on his TikTok account, accompanied by a song entitled, "Go to War."



*Image 6: Screenshot of TikTok Video from Jan. 6, 2021 (Ex. 4.9)*



*Image 7: Photograph Taken on Jan. 6, 2021*

### *Bender Ascends the Scaffolding*

Bender and Mitchell then climbed up scaffolding that had been erected for the inauguration of President Biden.  *See* Ex. 3.1 at 11:15 – 12:45.  Bender took a cell phone video that he later shared on his TikTok social media account.  The video showed police officers attempting to defend the Capitol Building from the rioters below by using pepper spray.  Bender then panned to an entrance of the Capitol Building and exclaimed, "we're storming the Capitol!"  The avatar on Bender's TikTok account was an image associated with the group "the Three Percenters." The "three percent ideology" refers to the belief that violent resistance to the U.S. federal government may be justified—and even obligatory—under certain conditions.  The term "three percenter" refers to the erroneous statistic that only three percent of American colonists took up arms during the American revolution.



*Image 8: Screenshot of TikTok Video from Jan. 6, 2021 (Ex. 4.10)*

### *Bender Enters and Makes His Way Around the Capitol Building*

Bender and Mitchell unlawfully entered the U.S. Capitol Building through the Upper West Terrace Door at about 2:45 p.m.  A vastly outnumbered group of USCP officers retreated from defending the door less than a minute earlier.



*Image 9: Screenshot of CCTV Video from Jan. 6, 2021 (Ex. 1.1)*

Bender recorded part of his unlawful presence in the Capitol Building, including his entry through the Upper West Terrace Door and travel to the Rotunda.  *See* Ex. 4.13, 5.12, 5.13.  In one of those videos, recorded immediately after Bender entered the Capitol, the alarm to the Upper West Terrace Door can be heard, and Bender chanted, "Whose house?  Our House!"  Ex. 5.12.  Inside the Rotunda, Bender exclaimed, "Right now, we're inside the Capitol. We just stormed the gates!"



*Image 10: Screenshot of Cell Phone Video from Jan. 6, 2021 (Ex. 5.13)*

Bender and Mitchell then proceeded through the Rotunda, down the East Front Corridor, through the Ohio Clock Corridor, down a hall, and into the Senate Chamber.  The government estimates that fewer than 70 people entered the Senate Floor on January 6, 2021.






*Images 11, 12, 13: Screenshots of CCTV Videos from Jan. 6, 2021 (Ex. 1.3, 1.4, 1.5)*

***Bender Enters the Senate Floor***

Bender and Mitchell entered the Senate Floor of the U.S. Capitol Building at approximately 3:04 p.m.





*Images 14, 15: Screenshots of CCTV Video from Jan. 6, 2021 (Ex. 1.9)*

While on the Senate Floor, Bender and his co-defendant reviewed documents that were sitting on tables.



*Image 16: Screenshot of CCTV Video from Jan. 6, 2021 (Ex. 1.9)*

Bender sat at a Senator's desk and then Mitchell took his picture.



*Image 17: Another Rioter's Cell Phone Image from Jan. 6, 2021 (Ex. 2.4, 1.11)*

Bender and Mitchell also took "selfies" from the Senate Floor.



*Image 18: Cell Phone Image from Jan. 6, 2021 (Ex 5.14, 5.15)*

Bender then ascended to the Senate Dais and posed for pictures with fellow rioter Jacob

Chansley.  Bender and Mitchell were among the very few rioters to go to the top level of the Dais.





*Images 19, 20: Screenshots of CCTV Video from Jan. 6, 2021 (Ex 1.11)*

At approximately 3:08 p.m., USCP officers entered the Senate Floor and directed Bender, Mitchell, and other individuals to leave the Chamber.



*Image 21: Screenshot of CCTV Video from Jan. 6, 2021 (Ex 1.10, 1.11)*

Bender and Mitchell left the U.S. Capitol through the Senate Carriage Door at approximately 3:10 p.m.  *See* Ex. 1.12, 1.13, 1.14, 1.15, 1.16, 1.17.

Later on January 6, Bender posted the TikTok videos described above.  He included captions such as, "It was so awsome [sic] to be apart [sic] of this.  We made our voices heard" and "A once in a lifetime day.  #patriots #fyp #trump2020 #viral #dc #patriotparty #proudboys[.]" Ex. 4.21 (metadata only).  In an Instagram post on January 6, 2021, Bender included the caption, "Today was something special if you were there.  It was great to be apart [sic] of it. #trump2020 #trump #dc #capital[.]"



*Image 22: Screenshot TikTok Video from Jan. 6, 2021 (Ex 4.8, 4.11)*

On January 7, 2021, Bender shared on Facebook a post from Mitchell.  The post contained an image of a skull surrounded by red smoke, with the caption, "Absolutely Proud of my fellow

Americans who made their voices heard at the Capitol."



*Image 23: Facebook Post from Jan. 7, 2021 (Ex 4.12)*

On January 19, 2021, the night before the Presidential inauguration was to take place, Bender posted a video to his TikTok account which had the following caption: "#duet with @brysonzero1 4 More years! #trumpismypresident #patriotparty #fuckbiden👹👹 #fyp[.]"  At the bottom of the video's screen, Bender wrote, "Hell yea 4 more years!! Lock them F**kers up[.]"

16



*Image 24: Facebook Post from Jan. 20, 2021 (Ex 4.7)*

### Bender's Statements and His Destruction of Evidence

On July 29, 2021, the Federal Bureau of Investigation ("FBI") interviewed Bender. Bender waived his *Miranda* rights and agreed to speak to FBI agents. He acknowledged his presence on the National Mall on January 6, 2021 and his choice to enter the U.S. Capitol. Bender identified himself in screen shots of video from inside the U.S. Capitol and identified defendant Mitchell as the person with whom he attended the events of January 6, 2021. Bender also told the agents where Mitchell worked and completed a written consent form permitting the FBI to search his electronic devices. He also told the agents that after returning to his and his parents' home on January 6, 2021, he spoke with his parents, deleted the photographs he had taken at the U.S. Capitol, stopped using the phone, and began using a new phone his parents had purchased for him. Ex. 3.1 at 16:00 – 17:45.

### III.    THE CHARGES AND STIPULATED TRIAL

On August 4, 2021, a federal grand jury returned an Indictment charging Bender with six counts: Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count One); Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1) (Count Two); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three); Entering and Remaining on the Floor of Congress, in violation of 40 U.S.C. § 5104(e)(2)(A) (Count Four); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Five); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Six).  *See* ECF No. 7.

On December 7, 2022, Bender was convicted of those offenses as the result of a stipulated trial.  He admitted an extensive factual basis that supported his conviction.  *See* ECF No. 95.

### IV.    STATUTORY PENALTIES

Bender now faces sentencing on all six counts in his Indictment.  As noted by the U.S. Probation Office, the statutory maximum term of imprisonment is 20 years on Count One; one year each on Counts Two and Three; and six months each on Counts Four, Five, and Six.  PSI ¶¶ 138-40.

The maximum term of supervised release is three years for Count One and one year for Counts Two and Three.  PSI ¶¶ 145-47.  The maximum fine is $250,000 for Count One; $100,000 for Counts Two and Three; and $5,000 for Counts Four through Six.  PSI ¶¶ 170-72.  Mandatory special assessments total $180.  PSI ¶¶ 173-75.

### V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

The Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *United States v. Gall*, 552 U.S. 38, 49 (2007).  As a matter of administration

and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence.  *Id.* at 49.  The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing.  *Id.* at 49.

While the government agrees with the sentencing range calculated by the Probation Office, the PSI does not include a Guidelines analysis for each of the counts to which Bender pleaded guilty.  *See* PSI ¶¶ 55-64.  Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments.  Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count."  Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3.  The PSI does not follow these steps, concluding that Counts One, Two and Three group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).  *See* PSI ¶ 54.

A full Guidelines analysis follows:

### *Count One: Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2).*

| Base offense level: | 14 | U.S.S.G. § 2J1.2(a) |
|---|---|---|
| Special Offense Characteristic | +3 | U.S.S.G. § 2J1.2(b)(2): "the offense resulted in substantial interference with the administration of justice." <br><br> For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" |

| | | |
|---|---|---|
| | | as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress," § 1515(a)(1)(B).<br><br>The official proceeding of Congress's Joint Session, which was required by the Constitution and federal statute, had to be halted while legislators were physically evacuated for their own safety. |
| Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense"<br><br>On July 29, 2021, FBI agents interviewed Bender, who waived his *Miranda* rights and agreed to speak to the agents. Bender acknowledged his presence on the National Mall on January 6, 2021 and his choice to enter the U.S. Capitol. Bender identified himself in screen shots of video from inside the U.S. Capitol.<br><br>He also told the FBI that after returning to his and his parents' home on January 6, 2021, on his parents' direction, he deleted the photographs he had taken at the U.S. Capitol, stopped using that phone, and began using a new phone his parents had purchased for him. *See* ECF No. 75 at 52. |
| Total | 19 | |

*Count Two: Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1).*

| Base Offense Level: | 4 | U.S.S.G. § 2B2.3(a) |
|---|---|---|
| Special Offense Characteristic | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." <br><br> On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Cross Reference | | U.S.S.G. § 2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." |
| Base Offense Level (adjusted) | 17 (from Count One) | U.S.S.G. § 2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." <br><br> Bender entered the restricted area of the Capitol complex for the purpose of obstructing the official proceeding—that is, stopping Congress from doing its work.  The substantive offense is thus Count One, and the base offense level for that crime should be applied. |
| Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense" <br><br> See discussion above. |
| Total | 19 | |

*Count Three:  Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2).*

| Base Offense Level: | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense" |

| | | |
|---|---|---|
| | | See discussion above. |
| Total | 12 | |

***Counts 4, 5, and 6:  Entering and Remaining on the Floor of Congress, 40 U.S.C. § 5104(e)(2)(A); Disorderly conduct in a Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(D); Parading, Demonstrating, or Picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G).***

| Base Offense Level | n/a | Because these offenses are Class B misdemeanors, the Guidelines do not apply to them.  *See* 18 U.S.C. § 3559; U.S.S.G. § 1B1.9. |
|---|---|---|

*Adjustments*

A two-level adjustment under U.S.S.G. § 3C1.1 applies because "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."  As Bender admitted in his July 29, 2021 interview with the FBI, after returning to his and his parents' home on January 6, 2021, he intentionally deleted the photographs he had taken at the U.S. Capitol, stopped using that phone, and began using a new phone.  *See* ECF No. 75 at 52; Ex. 3.1 at 15:48 – 18:25.  The reason he replaced his phone was, "so it's not traceable."  *Id.* at 15:55 – 16:07.   Such conduct was an attempt to thwart the investigation into his wrongdoing on January 6.  *See United States v. Korfhage*, 683 F. App'x 888, 892 (11th Cir. 2017) (affirming application of 3C1.1 enhancement where defendant deleted incriminating cell phone pictures, which materially hindered the investigation into his wrongdoing); *see also United States v. Massey*, 443 F.3d 814, 821 (11th Cir. 2006) ("Under U.S.S.G. § 3C1.1, the threshold for materiality is conspicuously low"); *United States v. Curtis*, 37 F.3d 301, 308 (7th Cir. 1994) (an individual has obstructed justice if he or she conceals evidence of a crime after being put on notice that a criminal investigation is in progress); *United States v.*

*Mellen*, 89 F. App'x 268, 2004 WL 438571, at *2 (D.C. Cir. Mar. 5, 2004) (enhancement for obstruction appropriate where defendant destroyed unopened boxes containing stolen equipment material to the investigation of her wrongdoing).

Bender has objected to application of the § 3C1.1 enhancement on the basis that he was following his parents' instructions rather than engaging in independent obstructive conduct. It is true that, when asked by an FBI agent why he obtained a new phone, Bender responded, "I don't know. My parents wanted me to." Ex. 3.1 at 15:55 – 16:00. Even if his self-serving statement is true, it is clear that the decision to obstruct the investigation into his wrongdoing was Bender's own. While he may have taken the advice of his parents on January 6, 2021 when he deleted incriminating pictures and discarded his phone, Bender's decision was not the product of unquestioning adherence to his parents' wishes. Just one day earlier, both parents sent text messages advising Bender to avoid D.C. on January 6. He did not listen.

Notwithstanding his obstructive conduct, the government believes that Bender has demonstrated sufficient acceptance of responsibility for the offenses of conviction such that a three-level reduction under Guidelines Section 3E1.1 still is appropriate. *See* PSI ¶¶ 42-44. Although "the Guidelines state that an adjustment for acceptance of responsibility 'ordinarily' is not available" when a court imposes an adjustment under § 3C1.1, in "extraordinary cases," both §§ 3C1.1 and 3E1.1 may apply. *See* U.S.S.G. § 3E1.1, cmt. n.4; *see also, e.g., United States v. Dozier*, 162 F.3d 120, 127 (D.C. Cir. 1998). The defendant bears the burden of proving that his case is "extraordinary." *See, e.g., United States v. Honken*, 184 F.3d 961, 968-69 (8th Cir. 1999). Courts consider "the totality of the circumstances, including the nature of the obstructive conduct and the degree of acceptance of responsibility," as well as whether "the obstruction of justice was an isolated incident early in the investigation or an on-going effort to obstruct the prosecution,"

whether the defendant "voluntarily terminated his obstructive conduct, or whether the conduct was stopped involuntarily by law enforcement." *See id.* Furthermore, the "district court should [note] whether [the defendant] admitted and recanted his obstructive conduct, or whether he denied obstruction of justice at sentencing." *Id.* An extraordinary case may exist where "a defendant who has obstructed justice nonetheless earns, by his other positive actions, an adjustment for acceptance of responsibility." *Id.* at 973.[3]

While Bender did initially destroy evidence – and did so in order to impede the investigation of his crimes – he claims that he acted with the encouragement of his parents, with whom he was living on January 6, 2021. Bender was 20 years old at the time. Although Bender should be held responsible for his obstructive conduct, he agreed to a voluntary interview with the FBI upon his arrest on July 29, 2021, readily admitted his crimes, including his destruction of evidence, and assisted the FBI by identifying his co-defendant as Landon Bryce Mitchell. Bender also admitted to an extensive Statement of Facts that accompanied his stipulated trial, permitting the government to avoid preparing for an adversarial trial of this matter. For these reasons, the government submits that application of both sections 3C1.1 and 3E1.1 is warranted. With such adjustments, Bender's total offense level is 16.

Bender argues that the specific offense characteristic ("SOC") set forth in U.S.S.G. § 2J1.2

---

[3]     *See also, e.g., United States v. Sorenson*, 233 F. Supp. 3d 690, 695-96 (S.D. Iowa), *aff'd*, 705 F. App'x 481 (8th Cir. 2017) ("Defendant's obstructive conduct was certainly methodical and could not in any way be characterized as aberrant. But he ultimately turned the corner and demonstrated acceptance of responsibility in ways beyond merely pleading guilty."); *United States v. Teyer*, 322 F. Supp. 2d 359, 368 (S.D.N.Y. 2004) ("The Sentencing Commission adopted the adjustment for acceptance of responsibility to create an incentive for defendants to plead guilty, admit their crimes, and thereby save both the Government's and the Court's resources in preparing for and conducting trial. Were courts to hold that any obstructive conduct, however early in the investigation or prosecution of a case and whatever its relationship to the charges ultimately brought, forever disentitled a defendant to credit for later acceptance of responsibility, this incentive would be ill served.").

is inapplicable to his conduct in this case pursuant to Judge McFadden's holding in *United States v. Seefried*, No. 21-cr-287(2) (TNM), 2022 WL 16528415 (D.D.C. Oct. 29, 2022).   The Government respectfully disagrees with the analysis in that case and believes that the SOC applies.[4]

U.S.S.G. § 2J1.2, which applies to "Obstruction of Justice" offenses, provides for a three-level increase "if the offense resulted in substantial interference with the administration of justice." U.S.S.G. § 2J1.2(b)(2).   This Court and many of its colleagues have applied that enhancement in cases involving a conviction under 18 U.S.C. § 1512(c)(2).   *See United States v. Rubenacker*, No. 21-cr-193, Sentencing Tr. at 60-81 (Howell, C.J.); *accord*, *United States v. Wilson*, No. 21-cr-345 (Lamberth, J.); *United States v. Hodgkins*, No. 21-cr-188 (Moss, J.); *United States v. Fairlamb*, No. 21-cr-120 (Lamberth, J.); *United States v. Chansley*, No. 21-cr-003 (Lamberth, J.); *United States v. Miller*, No. 21-cr-075 (Moss, J.); *United States v. Reffitt*, No. 21-cr-032 (Friedrich, J.) (contested); *United States v. Pruitt*, No. 21-cr-23 (Kelly, J.); *United States v. Robertson*, 21-cr-34 (Cooper, J.).

*First*, neither dictionary definitions nor usage analysis dictate that the term "administration of justice" be limited to a judicial or quasi-judicial proceeding.   *See United States v. Rubenacker*, No. 21-cr-193, Sentencing Tr. at 62-63.  Judge McFadden was correct to note that that the Black's

---

[4] Should the Court decline to apply this adjustment, the Government will seek an upward variance. *See United States v. Rubenacker,* No. 21-cr-193, Sentencing Tr. at 60-81 ("So even if defendant were correct – which he is not – that the SOCs in the guideline 2J1.2 did not cover congressional proceedings, … these SOCs capture specific harms warranting an increase in sentence severity … and warrant corresponding increases in the severity of the sentence by way of a departure or a variance"); *see also United States v. Reffitt*, No. 21-cr-32 (DLF), Sentencing Tr. at 36 ("it seems like it would lead to unwarranted sentencing disparities to apply [§ 2J1.2] … in only cases involving what we classically think of as administration of justice."); *id.* at 36-37 ("Even if I took the sort of plain language approach and did what you're suggesting, why wouldn't I, under 3553(a), enhance his sentence in a commensurate amount based on these enhancements?  Why wouldn't I, by analogy, get to the same place under 3553(a)?").

Law Dictionary definitions of "administration of justice" and "due administration of justice" "suggest that the 'administration of justice' involves a judicial or quasi-judicial tribunal that applies the force of the state to determine legal rights," *Seefried*, 2022 WL 16528415 at *2. However, Black's Law Dictionary also contains broader definitions of "justice" and "obstruction of justice," which relate to the orderly administration of the law more generally. *See United States v. Rubenacker*, No. 21-cr-193, Sentencing Tr. at 71-72. For example, Black's Law Dictionary defines "justice" to include "[t]he fair and proper administration of laws," and it defines "obstruction of justice" as "[i]nterference with the orderly administration of law and justice." Black's Law Dictionary (11th ed. 2019); *see also* Ballentine's Law Dictionary 696 (3d ed. 1969) (defining justice to include "exact conformity to some obligatory law"). Indeed, Black's Law Dictionary recognizes that "[c]onduct that defies the authority or dignity of a court *or legislature* . . . . interferes with the administration of justice." Black's Law Dictionary (11th ed. 2019) (emphasis added).

Similarly, while the *Seefried* Court's survey of uses of the term "administration of justice" in legal usage does suggest that the phrase is frequently (and perhaps predominantly) used to refer to "a judicial proceeding deciding legal rights," and to lesser extent, to "law enforcement activities," *Seefried*, 2022 WL 16528415, *5-*7, the simple fact that the term *usually* bears judicial connotations does not mean that it *must*, particularly where, as here, the Guideline's context, purpose, and commentary point in a different direction. Like all words, legal terms often bear multiple meanings. For example, the term "suppression of evidence" can refer either to a court's exclusion of evidence from trial or to the prosecution's withholding of favorable evidence from the defense. Which meaning the term bears in a particular instance cannot be determined by the frequency of each meaning within the legal corpus. And in this case, the frequent use of other

meanings is no reason to reject a broader meaning of "administration of justice" that gives full effect to the guideline and its commentary.  *See* U.S.S.G. § 2J1.2 cmt. n.1 (defining "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; *or the unnecessary expenditure of substantial governmental or court resources*") (emphasis added).

Second, Section 2J1.2's inclusion of definitions in the Commentary that undoubtedly relate to "investigations, verdicts, and judicial determinations" does not support a definition that excludes congressional proceedings.  The Commentary's use of the word "includes" indicates that the definition is not an exhaustive list.  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012).  As Judge Friedrich explained,

> I also think Part J generally refers to the administration of justice, and I don't think that we can infer simply because the Commission didn't include the phrase, 'official proceeding of Congress,' that it meant for that type of offense prosecuted under Section 1512(c)(2) to not be subject to the same aggravating factors that the Commission has delineated here.

*Reffitt*, No. 21-cr-32 (DLF), Sentencing Tr. at 37-38.  And the inclusion of the "premature or improper termination of a felony investigation" indicates that the definition applies to executive-branch investigations that are not yet before a grand jury or court.

Nor does reading the Commentary's use of the word "governmental . . . resources"[5] to include congressional resources would not "render[ ] the phrase 'or court' superfluous."  *Seefried*,

---

[5] The government's position that the events of January 6, 2021 caused the unnecessary expenditure of substantial governmental or court resources is based not on the number of defendants charged or prosecutions commenced, but on extensive expenditure of government resources in an effort to quell the breach – including the deployment of the USCP, the Metropolitan Police Department ("MPD"), the National Guard, and various other state and federal law enforcement agencies – and to clean up and repair the damage done to the Capitol building and grounds by the rioters. *Compare Seefried*, 2022 WL 16528415  at *8-9, *with Seefried*, Gov't Mem. in Aid of Sentencing, ECF No. 115 at 29; *see also Reffitt*, No. 21-cr-32 (DLF), Sentencing Tr. at 39 ("there's no question

ECF No. 123 at 17.   Although a "broad definition" of "governmental" could "include court resources," *id.*, using both terms in an attempt to sweep in all three branches of government is not a superfluity.   The Sentencing Commission could have added the word "court" to clarify that the term "governmental" did not exclude courts.   And the purported superfluity could be avoided by reading "governmental . . . resources" to refer to the resources of both the executive and legislative branches (as opposed to the judicial).   The superfluity canon provides no basis to limit the term to "*prosecutorial* resources."   *Id.*   Indeed, if the term "administration of justice" in § 2J1.2 refers only to "a judicial or related proceeding," *id.* at 1, then the word "governmental" is itself superfluous.

*Third*, there is no conflict between the government's interpretation of "administration of justice" in § 2J1.2 and the same term in 18 U.S.C. § 1503, which contains a catchall provision prohibiting obstruction of "the due administration of justice."   The Supreme Court has made clear that a term can have a different meaning in the Sentencing Guidelines than it does in a statute. *DePierre v. United States*, 564 U.S. 70, 87 (2011).   And there are at least three differences between § 1503 and § 2J1.2 that counsel in favor of reading them differently.   First, unlike § 1503, § 2J1.2 includes its own definition of the "administration of justice," which covers the expenditure of "governmental *or* court" resources.   Second, § 1503 appears in the context of a statute that applies to jurors, court officers, and judges, which may favor a narrower reading of the catchall provision for interference with the "due administration of justice."   And, third, § 2J1.2's entire purpose is to distinguish between levels of culpability for those who violate a wide variety of obstruction statutes, many of which are not limited to judicial or quasi-judicial proceedings.

---

that this costs the government a lot to respond with law enforcement officers and the delay in the vote, keeping members of Congress there late into the night to finish their job[.]").   The enhancement is best read as applying where the obstructive conduct itself—not the later prosecution of that conduct—caused the unnecessary expenditure of substantial governmental or court resources.

*Fourth*, the application of subsections (b)(1)(B) and (b)(2) only to offenses where the obstructed proceedings were "judicial" or "quasi-judicial" in nature itself creates line drawing problems. Those descriptors themselves raise difficult questions about how closely the obstructive conduct must "relate[]" to a judicial proceeding or what proceedings can be said to "determine[] rights or obligations." *Seefried*, ECF No. 123 at 1. For example, 18 U.S.C. § 1505 applies to obstruction of an investigation by the House Ethics Committee, which has the power to discipline current members of Congress. That inquiry would seem to be "quasi-judicial" and one that "determines rights or obligations," *id.* at 1, 4, yet it does not involve the "possibility of punishment by the state," *id.* at 4. The government's broader reading of "administration of justice," by contrast, would apply to all the obstruction offenses covered by § 2J1.2. Under the government's reading, therefore, a sentencing court need not answer difficult questions about whether a proceeding is sufficiently "judicial" or "quasi-judicial" to trigger subsections (b)(1)(B) and (b)(2).

### *Criminal History Category*

The U.S. Probation Office correctly calculated Bender's criminal history as Category II based on four prior convictions, which resulted in three criminal history points. PSI ¶¶ 66-69. However, as described below in the government's discussion of Bender's history and characteristics, that Category appears to underrepresent Bender's actual criminal history.

### VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

Sentencing is guided by 18 U.S.C. § 3553(a). The Section 3553(a) factors weigh in favor of a sentence of incarceration at the high end of the applicable Guidelines range.

### A.   Nature and Circumstances of the Offense

Bender's unlawful conduct on January 6, 2021 was part of a massive riot that delayed, and almost succeeded in preventing, the certification of the electoral college vote. Leading up to

January 6, Bender posted publicly his plans to travel to D.C. and his anticipation of violence. At the day's events, Bender was no mere spectator; in fact, he was one of the few rioters who breached the Senate Chamber, where he examined documents on Senators' desks. Following the violent entry of a mob into the Capitol Building, Bender himself ascended to the top of the Senate Dais, posing for "selfies" where the Vice President presides. The intent of the rioters like Bender was to frustrate the peaceful transition of Presidential power and throw the United States into a constitutional crisis. Following those events, Bender celebrated his own unlawful conduct and that of others in his social media accounts and then obstructed the investigation into his crimes by deleting photographs and discarding his cell phone. The nature and circumstances Bender's offenses are of the utmost seriousness, and justify the government's recommended sentence.

**B.  Bender's History and Characteristics**

Despite Bender's relatively young age, his crimes on January 6, 2021 were not an isolated incident in an otherwise law-abiding life. Probation reported that Bender has four prior convictions, resulting in three criminal history points:

- Carry Concealed Weapon (30 days jail, suspended) (1 point) (PSI ¶ 66)
- Grand Larceny (deferred disposition, subsequently dismissed) (0 points) (PSI ¶ 66)
- DWI-1st (30 days jail, suspended; 30 days jail imposed upon violation) (1 point) (PSI ¶ 67)
- Fail to Produce Weapon Permit (180 days jail, suspended) (1 point) (PSI ¶ 68)
- DWI-2nd Offense (180 days jail, 160 days suspended) (0 points) (PSI ¶ 68)

The PSI documents that, just four months after he invaded the Capitol Building, Bender was involved in a single vehicle traffic crash, after which he admitted to having four drinks earlier in the day while on the job. *Id.* at ¶ 66. Officers observed multiple beer cans and multiple firearms in the back of Bender's vehicle, including a concealed handgun. *Id.*

But the PSI also suggests that Bender's Criminal History Category under-represents the seriousness of his actual criminal history. Between March of 2019 and May of 2021, Bender

committed, or is accused of committing, crimes on four separate occasions, resulting in 16 separate charges (not including traffic convictions). PSI ¶¶ 66-75. Bender was arrested for his first DWI offense on January 26, 2021, almost three weeks after his participation in the assault on the Capitol building. PSI ¶ 67.

Bender also received no criminal history points for his unresolved case in Stafford County, Virginia, arising from conduct on July 7, 2020. Bender allegedly stole a piece of heavy construction equipment and misused it for nearly 45 minutes, causing extensive damage to an excavator, track loader, and nearby items. *See generally id.* at ¶ 75. He was arrested on November 28, 2022, *id.*, when forensic evidence tied him to the crimes. Bender has been charged with five offenses, including grand larceny and unauthorized use of a motor vehicle. *Id.* Had Bender been identified at or near the time of the alleged offense, he likely would have received at least one criminal history point. One additional criminal history point would have placed Bender into Category III and would have made his Guidelines range 27 to 33 months of incarceration, which is the range that the government estimated in its submission to the Court. See U.S.S.G. Ch. 5, Pt. A; ECF No. 83 at 1 n.2.

## C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[6] As with the nature and circumstances of the offense,

---

[6]     FBI Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

this factor supports a significant sentence of incarceration.  When Bender made his way into the Capitol, through a fog of police pepper spray and as alarms blared, it was abundantly clear to him that lawmakers, and the police officers trying to protect them, were under siege by rioters.  Police officers were overwhelmed, outnumbered, and in some cases, in serious danger.  Bender directly added to that danger.  His decisions to join a riot mob to stop the certification of the election, to invade the Senate Chamber, to rifle through a Senator's documents, and to pose for photos on the Dais of the Senate show utter disrespect for Congress, democracy, and the rule of law.

The government submits that this factor requires a sentence of imprisonment.  A lesser sentence would suggest to the public, in general, and other rioters, specifically, that crimes against police, and against Congress, are not taken seriously.  In this way, a lesser sentence could encourage further abuses.  *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.    The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B & C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

As this Court has explained, "[e]very defendant sentenced for their conduct on January 6th is in some ways – because of the general deterrence factor that all sentencing judges have to consider – … the scapegoats, the models for the punishment that can be meted out for anybody who engages in that kind of conduct."  *United States v. Mattice*, 21-cr-657 (BAH), Sentencing Tr.

at 69.  And by posing on the Senate Dais, Bender made himself the embodiment of the rioters on January 6, 2021.

The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others.  18 U.S.C. § 3553(a)(2)(B).  The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7]

As the Court has explained, "the importance of deterring future malcontents disappointed with the outcome of an election from planning for and then disrupting the peaceful transition of power after an election … weighs very heavily[.]"  *United States v. Mattice*, 21-cr-657 (BAH), Sentencing Tr. at 70.  It is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

There is need for specific deterrence here.  First, although Bender has just three countable points under the Sentencing Guidelines, his history of arrests and convictions shows a clear pattern of disregard for the rule of law.  *See* Section VI(B) *supra*.  Bender has been charged with 16 non-traffic offenses since March 2019 and has been convicted of four crimes.  PSI ¶¶ 1, 66-75.  But each of the 16 offenses resulted in no jail time, a suspended sentence, or has yet to be sentenced.  *Id*.  While Bender recently completed a term of probation without incident, he violated the terms of supervision for a 2021 conviction.  He does not appear to have been deterred by his previous interactions with the criminal justice system or the leniency that he has been shown.

---

[7]      *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

Second, although Bender has taken responsibility for actions that he now believes were "stupid," PSI ¶ 42, Bender's social media statements after January 6, 2021 lacked remorse or understanding for the event's impact on the history of this country, among other things. *See United States v. Mazzocco*, 21-cr-54 (TSC), Sentencing Tr. at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

Bender has "taken responsibility" for his wrongdoing, PSI ¶ 42, but he still seems to believe that his conduct was "stupid," rather than wrong. He has not acknowledged the damage done on January 6, 2021 and his own role. Therefore, a high-end sentence reflects the need for Bender's sentence to be sufficient to provide specific deterrence from committing future crimes like these, while acknowledging his acceptance of responsibility.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided

by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up).  Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).  In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021).  Consequently, a sentence within the Guidelines range ordinarily will not result in an unwarranted disparity.  *See United States v. Smocks*, 21-cr-198 (TSC), Sentencing Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).  After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The "open-ended" nature of

the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The government recommends a sentence at the top of the Guidelines range for both Bender and his co-defendant, Landon Mitchell. That is largely due to the identical nature of the

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, 22-cr-31 (FYP), Sentencing Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

defendants' conduct on January 6, 2021, as they traveled together to the rally, breached the Capitol Building together, and both invaded the Senate Floor, rifled through documents, ascended the Senate Dais, and posed for "selfies" where the Vice President presides.   There are notable distinctions between Bender and his co-defendant, but those counterbalance.  Mitchell has a higher criminal history category and repeatedly has violated the terms of his release, which justifies the three-month difference in the government's recommendations.   But a high-end sentence is appropriate for Bender, as well, because Bender's criminal history appears to understate his actual criminal conduct due to the pendency of charges from a 2020 offense and the suspension of most of his prior criminal sentences.  As far as the government is aware, Mitchell engaged in more violent rhetoric and exhibited defiance in the face of these criminal charges, though Bender obstructed the investigation into his wrongdoing by deleting cell phone images and replacing his phone.  Such conduct could have entirely resulted in the denial of credit for his acceptance of responsibility.  In addition, Bender identified Mitchell during his interview and has expressed remorse for what he calls "stupid" conduct on January 6, 2021.  It should be noted that neither defendant actually has accepted responsibility by admitting guilt for the crimes charged.

Other than his co-defendant's, Bender's case is most analogous to that of January 6 defendant Christian Secor.  *See United States v. Secor*, 21-cr-00157-TNM.   Secor entered the Senate Wing door of the Capitol at 2:26 p.m., approximately 13 minutes after it was initially breached.   Like Bender, Secor was college-aged on January 6, 2021.   Like Bender, at approximately 2:48 p.m., Secor entered the Senate Floor, made his way to the Senate Dais, and sat in the seat that had been occupied by Vice President Mike Pence approximately 30 minutes earlier. Also similar to Bender, Secor had ready access to firearms, deleted evidence, and expressed pride in his actions in his post-January 6 texts and social media posts.  But Secor's conduct was more

extensive than Bender's:   Secor served as the President of UCLA's "America First" Bruins organization that espouses extreme political ideologies and is alleged to have coordinated some of the unlawful conduct that occurred at the Capitol on January 6, 2021.  Secor passed through House Speaker Nancy Pelosi's office and then joined and assisted a group of rioters inside the building to push against the East Rotunda doors, which were being guarded by three Capitol Police officers. That group of rioters overpowered the officers, opened the doors, and assisted fellow rioters who entered the building.

Secor, in Criminal History Category I, faced a 51 to 63 month sentencing range, in part due to multiple potential enhancements for threatening injury or property damage.  Judge McFadden disagreed that Secor's conduct was dangerous, but stated: "In short, I think your conduct on January 6th was extremely serious.  Your actions were about as blatant and obstructive as any I've seen from that day that do not involve actual violence against law enforcement."  Sentencing Tr. at 49.  Judge McFadden then granted a downward departure to 42 months of imprisonment.

Bender may also be compared to Jacob Chansley, a fellow rioter with whom Bender posed on the Dais.  *See United States v. Chansley*, 21-cr-3 (RCL).  Due to his unusual garb and face paint, Chansley was one of the most recognizable January 6 defendants.  Chansley was among the first rioters to enter the Capitol Building, walking through the Senate Wing Door at around 2:14 p.m.  He confronted police outside the Senate and carried a bullhorn to rile up the crowd.  Chansley entered the Senate Gallery and then entered the Chamber itself.  While there, Chansley occupied the Dais and took pictures with Bender, Mitchell, and others.   Although he had no prior convictions, Chansley faced a higher sentencing range than Bender – 41 to 51 months – because he received an enhancement for threatening to cause physical injury.  But Chansley also demonstrated considerable acceptance of responsibility: on January 7, 2021, he called the FBI to

identify himself, and drove to an FBI field office to continue his interview, at which time he was arrested.  Chansley also was one of the first January 6 defendants to accept responsibility and plead guilty.  Judge Lamberth issued a low-end Guidelines sentence of 41 months.

Another comparable case is *United States v. Hodgkins*, 21-cr-88-RDM.  Paul Hodgkins unlawfully entered the U.S. Capitol at around 2:50 p.m., carrying a backpack that had, among other items, protective eye goggles, rope, and white latex gloves.  Like Bender, by 3:00 p.m., Hodgkins made it to the floor of the Senate, where he took several selfies and stood near Jacob Chansley on the Dais.  Although both Bender and Hodgkins demonstrated acceptance of responsibility, Hodgkins pleaded guilty very soon after his arrest.  Indeed, Hodgkins was the first January 6 defendant to be sentenced for a violation of § 1512(c).  Unlike Bender, Hodgkins did not leaf through Senators' sensitive documents.  He also did not delete evidence.  Hodgkins, in criminal history category I, faced a 15-21 month sentencing range.  Judge Moss granted a downward departure to 8 months.

Bender's conduct has a number of similarities to that of Secor, Chansley, and Hodgkins: all three defendants, like Bender, made their way not only onto the Senate Floor, but also near or onto the Senate Dais.  However, the nature and circumstances of his conduct and his history and characteristics are most like that of Secor, who Judge McFadden found to be nonviolent.  As Judge McFadden stated at Secor's sentencing, both defendants' decision to mount the Senate Dias "at the very time [former Vice President Pence] was supposed to be certifying the election showed a blatant disregard for the office of the Vice President and our system of government . . . That means you intended to obstruct the certification process occurring that day, a vital and solemn step in the peaceful transfer of power from one President to the next."  *United States v. Secor,* 21-cr-157 (TNM), Sentencing Tr. at 48.  Those actions, "[t]he sights we saw on January 6th, 2021, the crimes

you and others committed on that day are things Americans never thought they'd see in the Capitol Building, and we certainly never hope to see them again." *Id.* Accordingly, a sentence of 30 months, at the top of Bender's Guidelines range, would not create an unwarranted sentencing disparity.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014)

(restitution under the MVRA limited to the "offense of conviction" under Hughey).[9]   Both require

identification of a victim, defined in both statutes as "a person directly and proximately harmed as

a result of" the offense of conviction.[10]   *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C.

§ 3663A(a)(2).   "In view of the purpose of the MVRA and the interpretation of the VWPA's

definition of 'victim,' we agree with the Government that it is 'inconceivable that ... Congress

somehow meant to exclude the Government as a potential victim under the MVRA when it adopted

the definition of 'victim' contained in the VWPA.'"   *United States v. Ekanem*, 383 F.3d 40, 44 (2d

Cir. 2004).

     Both statutes identify similar covered costs, including lost property and certain expenses

of recovering from bodily injury.   *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b),

3663A(b).   Finally, under both the statutes, the government bears the burden by a preponderance

of the evidence to establish the amount of loss suffered by the victim.   *United States v. Bikundi*,

926 F.3d 761, 791 (D.C. Cir. 2019).   The relevant inquiry is the scope of the defendant's conduct

and the harm suffered by the victim as a result.   *See Emor*, 850 F. Supp. 2d at 202.   The use

of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in

which an exact dollar amount is inherently incalculable."[11]   *United States v. Gushlak*, 728 F.3d

---

[9] While both statutes generally limit restitution to losses resulting from conduct that is the basis of
the offense of conviction, they also authorize the court to impose restitution under the terms of a
plea agreement.   *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); *see also United States v.
Zerba,* 983 F.3d 983, 986 (8th Cir. 2020); *United States v. Giudice,* 2020 WL 220089, at *5 (D.N.J.
Jan. 15, 2020).   The defendant in this case did not enter into a plea agreement.

[10] The government or a governmental entity can be a "victim" for purposes of the VWPA and
MVRA.   *See United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012) (citations
omitted).

[11] The sentencing court should "articulate the specific factual findings underlying its restitution
order in order to enable appellate review."   *Fair*, 699 F.3d at 513.   Here, the Court should find

184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects.  As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49.  18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate."  *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).  By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires

---

that Bender's conduct in entering the Capitol building as part of a mob caused damage to that building.

imposition of full restitution without respect to a defendant's ability to pay.[12]

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), see 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

Specifically, the Court should require Bender to pay $2,000 in restitution for his convictions on Counts One through Six. This amount fairly reflects Bender's role in the offense and the damages resulting from his conduct. Moreover, in January 6 cases where the parties have entered into a guilty plea agreement, $2,000 consistently has been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Here, the government has no information to suggest that Bender was involved in specific property destruction. Accordingly, such a restitution order avoids sentencing disparity with other January 6 defendants.

---

[12] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

## VIII.   CONCLUSION

For the reasons stated above, the government recommends that the Court impose a sentence of 30 months of incarceration, three years of supervised release, $2,000 in restitution, and a $180 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      */s/ Jordan A. Konig*
JORDAN A. KONIG
Supervisory Trial Attorney, Tax Division,
U.S. Department of Justice
Detailed to the U.S. Attorney's Office
P.O. Box 55, Washington, D.C.  20044
Jordan.A.Konig@usdoj.gov
Tel.: 202-305-7917

*/s/ Samantha R. Miller*
SAMANTHA R. MILLER
Assistant United States Attorney
New York Bar No. 5342175
United States Attorney's Office
For the District of Columbia
601 D Street, NW 20001
Samantha.Miller@usdoj.gov